## THE COLUMBIA.

## THE HOWARD REEDER.

(District Court, D. Maryland. April 22, 1912.)

COLLISION (§ 102*)—STEAMER AND BARGE IN TOW—MUTUAL FAULTS OF STEAMER AND TUG.

The steamer Columbia, passing down the Brewerton Channel from Baltimore at night, came into collision with and sunk the barge Vane, which was passing up in tow of the tug Reeder on a 75-fathom hawser. The Reeder and tow were on the south side of the channel, and the Columbia had entered from the north side, when the tug signaled to pass port and port. From the positions of the vessels, the Columbia supposed the signal was not meant for her, and did not answer until it was repeated later, when she assented and went to starboard. The dredged channel was 600 feet wide, and the tug was so far to the south that the Columbia, in order to pass safely, went so close to the bank that she was caused to sheer to port and struck the barge before she could be controlled. *Held*, that the Reeder, while the privileged vessel, was in fault for being with her tow on the wrong side of the channel, and for requiring the Columbia to pass port to port, which clearly involved risk, when they could safely have passed starboard to starboard as the Reeder had just passed another steamer; that the Columbia was also in fault for assenting to the signal, and then keeping her speed of 12 miles an hour, which she maintained until she began to sheer.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit for collision by Frederick Hale, master of the barge Elizabeth E. Vane, against the steamship Columbia, the Chesapeake Steamship Company, claimant, and the tug Howard Reeder, brought in under admiralty rule 59 (29 Sup. Ct. xlvi). Decree against both the Columbia and the Reeder, for half damages against each.

Harry N. Abercrombie, for Hale.
Arthur D. Foster, for The Columbia.
Daniel H. Hayne, for The Howard Reeder.

ROSE, District Judge. This is a collision case. The vessels which came together were the steamship Columbia and the barge Elizabeth E. Vane. At the time the latter was in tow of the tug Howard Reeder. The barge was sunk. It and its cargo were a total loss. Its master libeled the Columbia. By petition under the fifty-ninth rule the latter brought in the Reeder. The Reeder filed a cross-libel against the Columbia. The cases were consolidated.

The Vane was of wood. It was 178 feet 9 inches long, and 23 feet 9 inches wide. It was laden with 550 tons of crushed stone. This cargo had been shipped at Port Deposit on the Susquehanna river. The Vane was to carry it to Hampton, Va. The Reeder undertook to tow the Vane to its destination. It was to take other barges down the bay at the same time. At the time of the collision the Reeder was towing the Vane up the Brewerton Channel to Baltimore, at which port the tow was to be made up. The Reeder and the Vane left Port

Deposit in the early afternoon of October 19, 1911. A 75-fathom hawser was used. The tug and the tow came into the Brewerton Channel, or near to the south side of it, somewhere in the neighborhood of bell buoy 19. That buoy marks the junction of the Cutoff and the Brewerton Channels. Some time after the Reeder and the Vane came into the vicinity of the bell buoy, and before the collision, they passed a large and fast steamship, the Florida. The latter was bound down from Baltimore to Norfolk. The passing was made starboard to starboard. Afterwards the Reeder signaled the Columbia that it proposed that their passing should be port to port. From the relative positions in which at this time the Columbia, on the one hand, and the Reeder and the Vane, on the other, appeared to those on the Columbia, the last named did not suppose that such signal could be intended for it. It accordingly did not answer. The Reeder repeated the signal. It may be stated that the wind was light. It was from the north or northeast. The tide was at the ebb. The night was misty, but all the vessels plainly saw the others' lights. To the second sounding of the one-blast signal by the Reeder, the Columbia replied with one blast. The Columbia was 287 feet over all. It had 46 feet breadth of beam. Its gross tonnage was about 2,500, its net something over 1,600. It was running about 12 miles an hour. The word "miles" not only in the above sentence, but in all other places in this opinion means nautical, and not statute, miles. The Columbia when proceeding at that rate of speed had a draught of about 16 or 17 feet. When the Columbia answered the Reeder's one-blast signal, the former had rounded buoy 30, and had passed from the Ft. McHenry into the Brewerton Channel. How far at this moment it had gotten beyond that buoy it is not possible to say with precise accuracy.

The captain of the Reeder made several different statements as to his position when he blew the second one-blast signal. At one time he says he was in sight of buoy 26 when he gave the second signal, but had not quite reached it. At another time he says he was only 30 feet away from the buoy, and again that it might have taken him a minute or a minute and a half to have reached it.

We know where the collision took place. The Vane sank almost immediately afterwards. From the way in which it was struck it is not probable that it thereafter moved many feet either up or down the channel. A witness for the defendant says that a buoy which the government placed on the wreck was 435 feet in a straight line from buoy 26. The same witness says that the temporary buoy was to the south of the center line of the channel. The channel is 600 feet wide. The collision therefore happened almost directly opposite buoy 26. If the tug was in time one minute short of buoy 26, the collision happened one minute plus the time it would take the tug to move the length of the hawser 450 feet thereafter. The tug was moving a mile in 10 minutes. It would have moved 450 feet in about 45 seconds. The collision therefore happened not more than 2 minutes after the signals were interchanged. Probably the interval was still shorter. While the tug was moving 1,050 feet, the Columbia would have moved 2,100. The Columbia at the time of the interchange of signals would

have been at the most a trifle over half a mile from the point of collision. Many of the witnesses think that there was a longer interval between the sounding of the one-blast signal by the Reeder and the collision. The captain of the Reeder says it was 6 minutes. He must be mistaken either in this or in the statement that he gave the signal when he was close to buoy 26. If he was within 1 minute of that buoy when he gave the signal, in 6 minutes thereafter the barge would have reached a point nearly one-half a mile beyond that at which it sank. The captain of the Reeder bases his statement that 6 minutes elapsed upon the assumption that he gave the signal at 7:29 and the collision happened at 7:35. As will be presently pointed out, the collision could not have taken place as early as 7:35. As the time which elapsed between his giving the signal and the collision was demonstrably less than 6 minutes, it is clear that he is in error in saying that at 7:29 he gave the signal which was answered. It is not impossible that he did give it at about 7:39. For reasons hereafter stated, I believe that there was much less time between the interchange of signals and the collision than many of the witnesses supposed. What happened after they were interchanged can be more easily understood upon the assumption that the time was very short.

After the Columbia answered the Reeder, the former was put on a S. E. ¼ S. course. No further change of course was intentionally made by it until it was abreast of the Reeder. They passed each other port to port at a distance of approximately 150 feet. As the Columbia came abreast of the tug, or immediately before it came abreast of it, the steamship began to sheer violently to port. Its helm was at once thrown hard to port. Its engines were put full speed astern. The sheer, however, could not be arrested. The Columbia struck the Vane about 20 feet abaft the latter's bow, and cut into it for some 16 feet. Until the sheer manifested itself the speed of the Columbia was not reduced. In its pleadings the Reeder claims that the Columbia's steering gear was out of order, and that the sheer resulted from that cause. There is nothing in the evidence to sustain this contention. The position in which the Vane was when the collision took place shows that at the time the sheer began the Columbia must have been close to, if not partly over, the south slope of the channel. When at a speed of 12 miles an hour a vessel of the Columbia's size and draught approaches the bank of a channel dredged 35 feet deep, or when it attempts to pass over such a bank, a rank sheer is very likely to take place. When such a thing happens, it cannot be controlled by the vessel's helm. I have no doubt that the sheer in this case was due to this cause, and to this cause alone. If the sheer had not taken place, there would have been no collision.

Why was the Columbia in a position in which such a sheer was not altogether unlikely to happen? The Columbia says that it went close to, or partly on, the south bank of the channel because it had to if it was to pass at a safe distance the tug and its tow port to port. This is one of the controverted questions in the case. I am persuaded that the Columbia's contention in this respect is well founded. The sheer manifested itself as the Columbia was passing the Reeder. There was

about 150 feet of water between them. The Columbia, of 46-feet beam, was then against the south bank. The Reeder, therefore, must have been much less than 300 feet from the bank; that is, it was on the wrong side of the center line of the channel. The Vane was a little farther south than the tug, although probably only a little farther. That the Vane at the time of the collision was in the south half of the channel is abundantly established in various ways. The effect of the collision would have been to have moved the Vane as a whole to the north. Another effect would be to throw its bow still farther to the northward, while its stern would swing to the south. It may be safely said that the Vane was carried somewhat to the north by the force of the collision. How great this movement may have been it is impossible to say. A number of witnesses were examined for the purpose of showing by one means or another the position of the wreck in the channel. In the argument it was assumed that there were important differences among these witnesses. I do not think that this assumption is really justified. There has been some confusion because the position of the buoy which the government placed over the wreck was subsequently changed. We know, however, from No. 43 of the Notice to Mariners issued by the Board of Lighthouses and the Coast and Geodetic Survey October 27, 1911, that it was originally fixed 15 feet west northwest of the wreck. The defendant has offered evidence tending to show that this buoy was almost precisely on the range lights marking the center of the channel. It follows that the wreck and all of it was in the south side of the channel, although, according to this contention, it was only a little south of the center. Both sides produced witnesses who said they had fixed the position of the wreck in the channel by certain measurements they had made. One competent engineer, produced on behalf of the Columbia, testified to very careful measurements and calculations. He said the wreck came within 124 feet of the toe of the south bank; that is, it extended to a point 176 feet south of the center line. One of the owners of the Reeder said that he found that a buoy placed on the wreck, and 30 feet from the stern, was 180 feet from a buoy which he planted on the south bank of the channel at a point where the water was 24 feet deep. Such point was probably about 16½ feet south of the toe of the south bank. The buoy on the wreck was therefore something like 163½ feet from such toe. Another witness, a certain Capt. Harrington, produced on behalf of the Reeder, says that he measured from a buoy on the wreck to buoy 26 on the north side of the channel, and found the distance to be 435 feet. This measurement placed the buoy on the wreck 165 feet, or in that neighborhood, south of the center line. All these results are near enough alike to make it certain that the wreck of the Vane lay in the south side of the channel.

Taking all things into consideration, I am satisfied that, when it was struck, it was not less than 100 feet to the south of the center line, perhaps more.

No explanation is given by any one on the tug or the tow as to why they were on the wrong side of the channel. Indeed of the four persons on the deck of the tug and the tow only one claims to know on

which side of the channel they were. Those on the Vane contented themselves with steering in the wake of the tug, as their duty was. The one who does attempt to locate the tug was its master. According to him, when the collision took place, the Reeder was on the line of the buoys on the north side of the channel. It is quite clear that this statement is incorrect. At the time of the collision, and apparently for some time before, the Vane was nearly in the Reeder's wake, a little on its port quarter, but not much. If the barge was 100 feet to the south of the center line, as I am persuaded it was, and it and the tug were connected by a hawser 450 feet long, the tug could not have been at the north edge of the channel, unless the tug and the tow were then crossing it on a course which would have much more closely approximated to a right angle than was the case. They were, it is true, moving towards the north side of the channel, but they were doing so on a course which was taking them from one side to the other much less rapidly. I do not think that there is any real doubt that at the time of the collision both the tug and the tow were in the south side of the channel. They came into it from its southern side. They never crossed its center line. The Florida passed them starboard to starboard. At that time they were in such a position, either in the south side of the channel or to the south of the channel, that such passing was made with so much room to spare that the captain of the Florida cannot be certain that he even recalls the passing at all.

There are two theories as to the place at which this passing took place. The captain of the Florida says that the only tug he recalls passing that night went by when his ship was in the neighborhood of the bell buoy. He says that the tug at that time was outside of the channel altogether and to the south of it. Such of the witnesses for the tug and tow as have any distinct recollection on the subject say that they did pass the Florida near the bell buoy. They claim that they were then in the channel, although in its southern half. If the Florida was passed at the bell buoy, one of two things must be true. Either the tug and tow must then have been well to the south of the channel, or they were unnecessarily tardy in getting into the northern half of it. The former is the more probable. For some time before the Columbia turned from the Ft. McHenry Channel into the Brewerton Channel the lights of the tug were visible from the Columbia. Under such conditions, the tug's green light should have been seen by the Columbia, unless the tug was then on a course which would ultimately have carried it across the channel from the south to the north. The Columbia's people say that except once, and then for a moment only, they never saw the Reeder's green light. I think, however, that it is demonstrable that the Florida actually passed the Reeder and the Vane at a point much nearer Baltimore than the bell buoy.

The distance from Ft. Carroll to the point of collision is about 2½ miles. From the latter point to the bell buoy is about 2⅛ miles. The bell buoy is therefore about 4⅔ miles from Ft. Carroll. Between these points the Florida's speed did not exceed 15 miles an hour. It

took it precisely one hour to run from Ft. Carroll to Sandy Point light, a distance of about 15 miles. The Columbia's speed at that time was close to 12 miles. The Columbia was making a mile in five minutes, the Florida one in four. Put in another way, while the Columbia was traveling 4 miles, the Florida went 5. When the Florida passed Ft. Carroll the Columbia had something less than a quarter of a mile to go before reaching that point. From Ft. Carroll to the place of collision was, as we have seen, 2½ miles. Between the passing of Ft. Carroll by the Florida and the collision the Columbia traveled not quite 2¾ miles. If the Florida made 5 miles to the Columbia's 4, the Florida covered 3½ miles while the Columbia was going about 2¾ miles to the place of collision. That is to say, at the time of the collision, the Florida was about a mile below buoy 26. It was still more than a mile short of the bell buoy.

I believe that the entries in the logbook of the Florida showing the time at which it passed the Lazaretto Light and subsequently Ft. Carroll are correct, as also the entry in the log of the Columbia showing the time at which it passed Ft. Carroll. If the Columbia was at Ft. Carroll at 7:29 it would have taken, at the speed at which it was traveling, about 12 minutes to have reached the place of collision, and the collision would have taken place about 7:41. If the Florida passed Ft. Carroll at 7:28, it would have traveled the 4⅔ miles to the bell buoy in about 18 minutes, and would have arrived there at about 7:46. Now, it is true that the log of the Florida says it arrived at the Seven Foot Knoll at 7:44. The Seven Foot Knoll is about two miles beyond the bell buoy. Capt. Almy of the Florida says that the entry 7:44 is a clerical mistake for 7:54. There can be no doubt that he is right. At 15 miles an hour, it would have taken the Florida 26 minutes from Ft. Carroll to the Seven Foot Knoll, and 26 minutes would have brought it there at precisely 7:54. Moreover, from the Seven Foot Knoll to the Sandy Point Light is about 8½ miles. At 15 miles an hour the Florida would have traveled this distance in 34 minutes, and would have arrived there at 8:28, which is precisely the time her log shows she did arrive. It follows that the Florida did not pass the bell buoy until five minutes after the collision had taken place.

It has been stated that the witnesses have been inclined to fix the time of the collision as about 7:35. The facts already stated show that it could not have taken place much before 7:41. The Reeder and the Vane traveled about six miles an hour. It would have taken them at that rate of speed about 21 minutes to go from the bell buoy to the place of collision. If the collision took place as early as 7:35, they must have passed the bell buoy at 7:14, which was 14 minutes before the Florida reached Ft. Carroll. If the collision took place at 7:41, they must have passed the bell buoy as early as 7:20, which was 8 minutes before the Florida got to Ft. Carroll. Even upon the impossible assumption that the entry in the logbook of the Florida that the time it passed Seven Foot Knoll is not erroneous, the Florida must have gone by the bell buoy not earlier than 7:36, and; if it there passed the tug and its tow, the collision could not have taken place until 7:57, very much later than anybody supposes it did take place. All these

circumstances confirm the conclusion already reached, that the Florida at the time of the collision had not yet reached the bell buoy, and was not more than about one mile below the point at which the collision took place. It has further support. Upon the assumption that the boats came together about 7:41, the collision took place 13 minutes after the Florida passed Ft. Carroll. By that time the Florida would have traversed $3\frac{1}{4}$ miles, and would have been only $\frac{3}{4}$ of a mile beyond the place of collision. To pass over this $\frac{3}{4}$ of a mile would have taken the Florida 3 minutes. If that be true, the Vane passed the Florida about 1,300 feet east of the point of collision. At that time the Columbia would have been 2,600 feet west of the point of collision. In that case at the time the Florida passed the Vane the Columbia was less than 3,900 feet away, or not quite $\frac{2}{3}$ of a mile.

For these reasons, I am constrained to find that the Florida passed the Reeder and the Vane not more than a mile ahead of the Columbia. As the Columbia was traveling 12 miles an hour towards the Vane, and the Vane 6 miles an hour towards the Columbia, the time which elapsed between the passing of the Vane by the Florida and the collision was probably slightly less than $3\frac{1}{2}$ minutes. Assuming this to be true, what afterwards happened is easy to understand. The Reeder blew one blast to the Columbia. The Columbia at that time was on the northernmost side of the channel. In this position the Columbia did not suppose that the Reeder could intend the signal for it. It was easy for the Reeder and the Vane to pass the Columbia as they had passed the Florida. The Columbia accordingly did not answer. By the time the second signal was given some moments had elapsed. The Columbia attempted to pass port to port. To do so safely it was necessary for her to get very close to the south bank. The sheer followed. Such being the state of facts, the Reeder was, in my judgment, in fault. It had no right to call upon the Columbia to execute a manœuvre which, as the result showed, could be carried out with perfect safety only upon condition that the Columbia should instantly and greatly reduce her speed and otherwise navigate with great care and caution.

As between the Columbia and the Reeder, the latter was unquestionably the privileged vessel. It had the right, however, to exercise its privilege only for its own protection. It had no right unnecessarily to increase the difficulties of the Columbia. There would have been neither difficulty nor danger in its passing the Columbia as it had passed the Florida. There was difficulty and danger in the method of passing it compelled.

Nor is the Columbia free from blame. The fact that its captain when he heard the first signal from the Reeder did not believe it could be intended for his vessel strongly suggests that he then appreciated that the manœuvre indicated by that signal if it was intended for his ship would be a delicate one. It became all the more delicate by the lapse of time resulting from his failure immediately to respond to it. When the second signal was sounded by the Reeder, he should either have at once reversed his engines and given the danger signal, or have instantly greatly reduced his speed. He did neither. He undertook the dangerous manœuvre of running his ves-

sel at full speed to the extreme south bank of the channel. A result followed which as an experienced navigator he must have known was under the circumstances possible, if not probable.

Both the Columbia and the Reeder agree that the Vane was not in fault. The conclusion follows that the damage caused by the collision must be divided equally between the Columbia and the Reeder.

After having announced at the close of the hearing that I should hold both the Columbia and the Reeder in fault, at a subsequent day the parties were given a hearing upon the ascertainment of damage. The only difficult question involved was the value of the Vane at the time of the collision. That was not a matter of accounting. It seemed unnecessary to incur the delay and expense of a reference. There was the usual conflicting testimony as to the value of the Vane. It was not a new vessel. On the other hand, it seems to have been in excellent condition and repair. As a result of causes which have manifested themselves in many other directions, the cost of construction of such a barge is now greater than it was at the time it was built. The price of such vessels has accordingly increased.

Taking all the considerations together, I find the fair market value of the Vane at the time it was sunk was $10,000. I shall allow that sum with interest from the date of the hearing on the assessment of damages.

I find her net earned freight at the time of the collision to have been $100.

The other items of damage, viz., the value of the cargo and of the personal effects of the captain and crew of the Vane, and the damage to the Reeder, have been agreed upon among the parties.